Ivor Media and Peter Deptula, who are the plaintiffs below in the appellants before this court. This is, of course, a trademark infringement case. And the plaintiff's mark is the word SURVIVOR, spelled with an F. S-U-R-F-V-I-V-O-R. The plaintiffs began using that mark in 1986. And Mr. Deptula, one of the plaintiffs, is the owner of three federal trademark registrations. One that was issued in 1992 in Class 25 for clothing, specifically T-shirts. That registration is incontestable status. A 1997 registration for SURVIVOR for body boards and surfboards. And a registration for sunscreen preparations and lip balm that has a priority date of June 1993. Each of these registrations are for the mark SURVIVOR in block letters. The defendants, specifically what we refer to as the CBS defendants, which are all the defendants other than WPC brands, began airing a TV show in May of 2000. This TV show was called SURVIVOR, without an F. It quickly became one of the most successful TV shows probably in history, but certainly in current times. And in an effort to take advantage of the success of that TV show, the defendants began a marketing merchandising program using their SURVIVOR mark. This was, of course, long after the plaintiffs in this case, SURVIVOR Media and Mr. Deptula, began using their SURVIVOR mark. Counsel, with that in mind, would you say that your primary claim is for reverse confusion? You know, that's an interesting question. And certainly going into this case, the primary, not exclusive, but primary allegations in the complaint were for reverse confusion. Where did you assert a forward confusion claim? A couple of places, Your Honor. The most, the best example I can probably give is the assertion in paragraph number 34 of the complaint, which is at page eight of the record, where we make assertions as to confusion as to affiliation. And as the court in the, I hope I pronounce this correctly, Trouble versus Wet Seal case, which was decided by the Southern District in New York in 2001, the district court in that case recognized that in the real world, confusion doesn't necessarily get expressed solely as reverse confusion or solely as wholesale confusion or solely as point of sale confusion. It comes up in different circumstances. And in Trouble, the court specifically held that the allegations as to affiliation were sufficient in order to state a claim for not only reverse confusion, but also forward. Wasn't this a summary judgment? The Trouble case? This case. The case here, yes. Was it involved in a summary judgment? Absolutely. So how did you raise the material issue of fact regarding the forward confusion claim? Well, Your Honor, there's a considerable amount of evidence that the court disregarded in regard to actual confusion. Well, I mean, I understand. We haven't talked about the reverse confusion. I understand that there's evidence regarding that. But what in the record are you asserting raised the material question of fact regarding the forward confusion claim? Well, that's a tough question to answer, Your Honor, because, for example, when the personnel at Long's Drug Stores were confused about which survivor was which survivor, it's not altogether clear whether their confusion in each instance is either forward or reverse. Some of them could have been reversed, and some of them could have been forward. So you're saying that the people could have been confused as to whether or not the Survivor, I call it, TV series products were taking advantage of the Survivor brand. Is that what you're saying? I think that's true, Your Honor, because people, when they're confused, they don't go. No one except lawyers in courts ever go, oh, I'm reverse confused. It's a matter of there's a confusion. And, for example, in the Long's Drug Store example, it's not altogether clear whether it was reverse confusion or forward confusion. Well, I guess a fair inference is that the Survivor brand was not nearly as well known as the Survivor name linked to the TV show. Your Honor, I don't think we even have to make that inference. I think it's an absolute fact. So that's why I'm a little confused as to how the forward confusion claim lies. But go ahead. I want to ask you a question, though, since we've gotten into it. I'll be frank. This is the first case I've ever had involving reverse confusion. And I don't understand what the damages are. What would your damages be? Well, the damages would be to the extent, well, we actually had a long motion on that in the district court, Your Honor. No, but give me a simple answer. What are your damages? The damages are the loss of goodwill, for example. What's the loss of goodwill? You're getting a lot of free advertising. Well, that's certainly one way to look at it. But, Your Honor, it's almost like there was a, I believe there was a rock group or a musician a few years ago called Manila, I think it was, who was a fake. It turns out his recordings were fake. And he lost his complete credibility. The same problem arises here. What is that analogy? His recordings were fake? How does that relate? Well, the problem is that he was a fake recording artist, Your Honor, and here people see the survivor mark. The people of the reverse confusion see the survivor mark as being a false imitation, for example, of the... What does that mean? What are the damages done to you for having a very popular television show associated with your body? I don't understand it. We've lost the control of our mark that we've had for... How does that hurt you? You're not dealing with a bunch of charlatans. You're dealing with a huge company with every interest in promoting its product. Where is the harm? The only harm I can specifically point to at this point, Your Honor, is that we've lost control of the mark. Well, now look, you brought up a lawsuit. Yes, sir. You say there are damages. Give me a ballpark. If somebody said, I'm going to give you a judgment right now, what would you expect to get, a dollar? No, I think we're entitled to get, as are damages, the profits that they have made on the infringing products. Well, that's ridiculous. I mean, I would think if you get your attorney's fees, that's about all you're going to get. Well, we would certainly get injunctive release as well, Your Honor, at the minimum. Would you? What? Because there's got to be harm to have a case. I'll tell you, maybe I should read a lot more on it, but I don't understand, at least in the posture that you are in, how a reverse conclusion amounts to anything. Well, the harm, Your Honor, is the loss of control of the goodwill for your mark. That's the specific harm that arises in a reverse conclusion. Loss of control. And what is the consequence? The consequences are the distinction that you have tried to create, as your mark being the source of your confusion, another mark being the source of somebody else's confusion. Well, it's a wonderfully intangible harm. So you're arguing basically that your mark has been swallowed up by the survivor. That's precisely the argument that is a reverse conclusion case. Well, you could put it, your mark has been magnified. It's been given a tremendous push, because people will often buy you thinking they're buying the other, and you're in great shape. That's possible, Your Honor. Possible, likely, you're saying. I beg your pardon? You're saying it's likely. You hold cases and it's quite likely. It is quite likely that there's been confusion. Well, remember, at the very least, damages will be handsomely mitigated by the benefit that has been conferred upon you. That may be true. Does the evidence show that survivor products increased after entry into the market of these survivor paper-in products? Your Honor, that's a question that I'm not, I believe, I haven't looked to address that question for this argument, but I believe, and my recollection is that the evidence is the contrary, that the sales declined. But I have to admit, I could be 100% wrong on that answer. In any event, the defendants, when they adopted their survivor mark, were well aware, in fact, they admit having actual knowledge of the plaintiff's use of their mark, the plaintiff's registration of their mark, the plaintiff's use of their mark on T-shirts, sunscreen, and offerings for sale of their products at various retail locations, including specifically on the Internet. Is it your position, then, that if they hadn't decided to come into Hawaii, which was primarily your market, you wouldn't have lost them? Only to the extent we might not have known about their products. But I don't think that the fact that the plaintiff's market primarily in Hawaii has anything really to do with this case. In fact, I think that was an error that the court below made, Your Honor. Federal trademark registrations give national rights. The Park and Fly Supreme Court case clearly establishes that. I think probably the reason the court made that statement was because if you didn't get into the same market, the likelihood of confusion would be extremely rare because you sell such different things. In fact, that is a conclusion that I certainly don't agree with, Your Honor, as far as selling different things. But you had a little, well, I won't say little, but you had a clever turn of the word, and you were looking at a certain segment of a possible larger market. You were looking for people who wanted to do what you wanted them to do, and that's, I think, it's kind of clever to say survival because we've got this little pocket, and that's what we're doing, and survival is pretty much a national outfit, as you point out. It's a very successful television show. But I don't think a trademark owner's, you're right, it's perhaps to some degree, Judge Ferris, in regard to the market is concerned, but there has to be some overlap in markets. I wasn't trying to justify a rationale. I was merely saying why the district court may have looked at the market. In fact, I would like to address your comment in regard to the goods being different, Your Honor. That is a conclusion that I find impossible to grasp and get a hold of because, as a matter of fact, both parties use their mark on several identical goods, T-shirts, shorts, mugs, hats, keychains, sunscreen, and lip balm. Each party, each side uses the mark on those products. And the history will show how this record shows how it developed. You didn't start off using the same thing. You did this and then a little more and a little more. Isn't that what the record shows? As far as the plaintiff's use? Yes. Of course. I mean, every business, even CBS, when it started out back in the 30s or 40s. Go ahead with your argument. The fact of the matter is, and I don't, as I say, I have a hard time grasping how we got away from the conclusion that at least as to the same goods that the parties are using the mark on, which I have just enumerated, and how those can be anything but related. The court below, citing sleek craft, said the goods are related if they are complementary, they are sold to the same class of purchasers, or they are similar in use or function. And for the life of me, I cannot figure out how T-shirts, shorts, mugs, hats, keychains, sunscreen, and lip balm, all produced and sold by both sides, do not meet each one of those criteria. And all you have to do is meet one of them. Doesn't the record show that Survivor gave up on some of the products you're talking about because it didn't sell? The record is that WPC brand, the defendants, have, while this litigation was pending, after the Plum Rain Junction ceased apparently to be manufacturing and selling at least sunscreen. I thought more, but anyway, I looked to be sure. My recollection is more. And if what you're saying is true, why in the world would you go out of business? That's why I don't think that was the confusion. But I haven't decided. That's why I'm going to listen to you. Well, Your Honor, there are several reasons. I just haven't decided. There are several reasons why WPC brands cease selling Survivor products, all of which are in the record below, but they're not part of the record in this case because it wasn't an issue previously. The court below decided that the products were not related because they are directed to a different segment of the public and are obviously not to be considered interchangeable. Now, I suggest to you that when you go to Long's Drugs and you see on the shelf Survivor sunscreen and Survivor sunscreen right next to each other, to say that they're directed to a different segment of the public and are obviously not interchangeable, it boggles my mind, as I say. The fact of the matter is, as the photograph, which is in record 24, reflects, they're on the shelves right next to each other. The Long's personnel can be in some locations, but not right downtown. I don't think either Survivor product is currently in Long's Drugs, and certainly not downtown. Okay. So you're talking about the past. I'm talking about other. There are. I forgot how many Long's Drugs here there are, Your Honor, but there are multiple. The plaintiff's products, nor do I believe the defendant's products, were ever in each of the Long's Drugs stores. But at some Long's Drugs stores where they were marketed at the same, both had marketed, they were right next to each other. And certainly, Your Honor, when you go into a Sears or a JCPenney, where the record is both parties sold their goods, and you have racks and racks of T-shirts to suggest that the T-shirt that had the plaintiff's brand and the T-shirt that had the defendant's brand are not interchangeable or being sold to the same people, I don't think it's a conclusion that can stand up. If the Court, please, have some questions I'd like to reserve. I just have a follow-up question on the forward confusion. Yes. You had cited me to page 8 of the record where you said that there was language that would support a claim of forward confusion. But in contrast, when you're talking about the reverse confusion, you use specific language. For instance, you said, defendant's adoption and use of the survivor mark have resulted in the false, misleading, and confusion conclusion in the minds of consumers that plaintiff's goods emanate from or are associated with or endorse the defendant's. That verifies a reverse confusion claim. Absolutely, Your Honor. Now, where is similar language? The only language – Can I finish my question? I'm sorry. Where is similar language that specifically sets forth the forward confusion claim as you did reverse confusion claim? The only place that I specifically point to, and it's not as specifically alleged as the reverse confusion, is the allegation regarding affiliation, which appears at paragraph 34 on page 8 of the record. So wouldn't it be fair for us to conclude that if you intended to raise a forward confusion claim, that you would at least have been as specific as you were with the reverse confusion claim? That's an inference that the court could certainly conclude. All right, thank you. Do you want to reserve the rest of your time? I'd like to reserve. Thank you. Thank you, Your Honor. If it pleases the Court, my name is Andrew White, and I represent the defendants and appellees, CBS and the other parties. I'm aware that the Court is very familiar with the briefs and the record, and I don't intend to repeat all of them. Can I ask you a preliminary question? Please. Do you know by now you misstated the state of the review? Your Honor, I am intimately familiar with footnote 1 of Greenewark's case, and yes. And I apologize to the Court. How did that ever happen? There were cases, Ninth Circuit cases and cases from other circuits, that suggested that on evaluating undisputed evidence. But it was disputed. This was summary judgment. Did you do a much appellate work? Yes, Your Honor. Well, you must know the standard. How could you misstate to this Court the standard of the review on summary judgment? It's incredible. It was a mistake, and for that I apologize, Your Honor. Well, you should. And I have read those cases now deeply, and footnote 1 of the Greenewark's case is as clear as it could be. And I apologize to the Court for it. Well, you led us down the wrong path. You don't lose your case, but it really is strange. And I apologize for that, Your Honor. I've got a follow-up question. Why didn't you settle this case? We attempted very hard, Your Honor. They wanted too much? I'd be happy to tell you what we offered. I don't think that's appropriate, but we offered money to settle this case, and it wouldn't settle. It's a very strange case to proceed it all this way. I find it, frankly, hard to see whether any damages are involved. Well, the Court asked a bunch of questions, and the truth is that there was pending. It was mooted by the grant of summary judgment on this hearing, on this motion, but there was a motion for summary judgment on damages as well because the evidence, again, the undisputed evidence showed that there was no decline. If anything, plaintiff's sales ticked up very, very slightly over the period in question, so there was no decline. And you would think they would pick up a lot. They got a lot of free advertising. Well, if the products had, in fact, been distributed widely in the same territory, that's possible, but the fact shows, as the Court has noted, that the plaintiff's products were almost exclusively in Hawaii, and the defendant's products were almost exclusively on the mainland. There was only a very minimal overlap geographically, and almost no overlap in terms of the actual stores where they were. But, counsel, as you know, in summary judgment, we have to view the facts and the likes as most favorable to the non-movement. Absolutely. So with that in mind, is it still your view that there were not disputed issues of fact in this case, keeping in mind that summary judgment is disfavored in trademark infringement cases? I understand that, and I appreciate that question, Justice Rawlinson, and the answer is absolutely yes. The undisputed evidence. No, we're judges. Some people say there is no justice in the nice service. The undisputed evidence that I would like to focus on is really with respect to three of the sleek craft factors. The difference, the significant difference between the sight, sound, and meaning of the parties' marks. The undisputed evidence that there is no actual confusion in the marketplace between the products' marks. Was that evidence undisputed? Actual confusion? Yes, it was, Your Honor, and I'll explain that when I get to it. And finally, the weakness of the mark, the word survivor as a trademark, whether it's on my client's product or on the plaintiff's product. With respect to the difference between the sight, sound, and meaning of the party's marks, I think the most curious aspect of this case is that when Mr. Mackey is talking about the strength of mark, he argues that his client's mark, survivor, is a unique and totally different word from the common English word survivor. But when he is talking about other aspects of the case, particularly sight, sound, and meaning, he says, oh, survivor and survivor are exactly the same effect. He argued today, as he did below, that they're pronounced the same, survivor, not pronouncing the F. But the plaintiff's counsel can't have both ways. Either survivor is a unique and totally different word from survivor, in which case there's no commonality of sight, sound, and meaning, or they're the same, in which case it's a very weak mark. But we think the plaintiff's got it right the first time. There is a huge difference between the sight, sound, and meaning of the party's trademarks. In fact, the record shows that the plaintiff, Mr. Deptula, chose the word survivor specifically to highlight the word surf in his name, meaning someone who has survived the surf. And, in fact, in a prior trademark proceeding against the company Herman's Survivors that produced shoes under the name Survivor, and this is at Supplemental Record 465, Mr. Deptula took the exact opposite position that he's taking here. We cited this to the record, this record, I'm sorry, we cited this evidence to the court where Mr. Deptula, in the Herman Survivor case, said there is no likelihood of confusion, mistake, or deception because the applicant's mark, meaning survivor, is not confusingly similar to pleaded marks of the opposer, surfed by. How was that case resolved? Was there a trial? It was ultimately settled. There was no trial. So we have no determination regarding that issue. You're just telling us that to make the point that they took an inconsistent position in this case. We cannot argue collateral estoppel or judicial estoppel because there was no final ruling. But it is evidence, Mr. Deptula himself approved that pleading, taking the exact opposite position, that surfed by and survivor are not the same and are not confusing. In contrast to surfed by, of course, all of the survivor merchandise put out by my clients highlights the connection to the TV show, which, of course, is based on the theme of surviving. And, of course, the Ninth Circuit authorities emphasize that when you evaluate the sight, sound, and meaning of different trademarks, you have to focus on how those trademarks are actually used in Congress. Counsel, that's part of the difficulty I have with this case. Didn't the district court weigh the evidence as opposed to considering the evidence and the like most favorable to the non-movement? Well, with respect to this specific issue, Your Honor, I don't think there is any conceivable dispute in the record, how the parties' marks appear in Congress. There was evidence presented on both sides. And we have submitted the declaration of Marianne Martin, which is a supplemental excerpt of record starting at page 118, color copies of our trademarks. I fear that the court's color copies didn't, they probably came out like mine did, much. This is supplemental excerpt of record 125, which is the trademark, the logo that appears on our cases. This is 127, which is how the survivor mark appears on the Africa series. And this is 129, which is how the mark appears on the Australia series. That is how my client's mark appears in Congress. Counsel, the difficulty is that both of these marks, you know, sort of evoke images of outdoors, beautiful nature, scenes. And I'm not sure that it wouldn't be up to a jury to decide the issue of how similar they are as opposed to a court saying they're dissimilar. Well, there is an outdoor element to both. There's no question about that. And that's, of course, why the plaintiff chose the word survivor and then added the word surf onto it. There's no question that there's that element to it. But you have to look at the sight, sound, and meaning, and the overall meaning of the client's mark, particularly when you see it the only way it appears on merchandise, which is with the logo. Here goes your time. The only way my client's mark appears is in the entire logo, which includes not only the word survivor, but the words Outlast, Outplay, and Outlast, or Outlift, Outplay, and Outlast around the mark. And then elements from the show. This is Australia. This is a kangaroo in an outback scene. That's the only way my client's mark appears on any of this souvenir merchandise. And that mark evokes the television show. And it's intended, we had artists commissioned to create this logo specifically to evoke images from the television show. Not the general concept of being outdoors, and not the concept of surviving anything, but the television show. That's what these logos were designed to bring to mind. And all the licensees who produce any of our souvenir merchandise are contractually obligated and do put the entire logo on the T-shirt. And I think that plaintiff's counsel recognize that that logo precludes any possibility of confusion, because they repeatedly attempt to present differences. Isn't there more than the logo that prevents confusion in this case? Isn't that undisputed? There is certainly more than the logo. Absolutely, Your Honor. There is actual confusion out there. I was focusing on one of the elements, which is the sight, sound, and meaning, which is one of the sleep factors. Let me shift to the evidence. And the evidence is undisputed, Judge Rawlinson, about the actual confusion or the absence of actual confusion in the record. First of all, with respect to the T-shirts, even Mr. Mackey, I don't believe, would attempt to argue that there's any confusion between his client's primary T-shirt, which is a University of Hawaii basketball T-shirt, and my client's survivor logo T-shirt. With respect to lip balm, which is another product they refer to. Well, he sold one more than he might have sold, because you've got one. Well, that's true. His sales undoubtedly went up when we went out to the market to get these things. I'll have to grant you that. The evidence is clear that he's never sold lip balm, ever. But he says he uses them for promotion, he says. I'm sorry? He uses them for promotional purposes. Seven years ago, before our client was ever, in 1997 was the last time he ever made any and ever gave it away. He's never sold lip balm. So we're really down to the sunscreen. How about cups, mugs? Mugs aren't an issue, or keychains? There is no, we have no evidence, there's no evidence of the record of a mug or a keychain with this logo. It's the University of Hawaii logo. Seventy to eighty percent of their product has nothing to do with the word Surf Viber. It's the University of Hawaii logo. So it's your representation that the keychain and the mug and the t-shirt are all University of Hawaii. I'm sorry, not all of them. There is this t-shirt that the plant also produces. We have no idea how many of these are sold. The overwhelming majority of the plaintiff's t-shirts are the University Collegiate logo. But if he sells also t-shirts that are not University of Hawaii, doesn't that legitimately raise a question as to whether or not he can survive some re-judgment on the similarity issue? Well, let me go to the issue of actual confusions. I think that's the focus here. And the evidence that Mr. Mackey referred to, not in his opening brief, but in his reply brief, was evidence that the plaintiffs themselves solicited and instigated. And a prime example of that is the declaration of Dana Durrett, their director of operations, who went to a longs drugstore here in Hawaii in Mo'olili. And this was in preparation for this lawsuit. Mr. Durretto goes into the store knowing that they don't carry Surf Viber sunscreen. And he goes up to a customer who's in the sunscreen area and says, you ought to consider Survivor sunscreen. And the clerk, trying to promote his product, trying to promote his sales, brings out some Survivor sunscreen. That's a plaintiff-instigated encounter. That's not evidence, that's not actual evidence of actual confusion by any consumer or any store personnel. And the district court, I believe, was quite within its realm in rejecting these plaintiff-instigated and plaintiff-initiated. What about the trade show attendee? Is it your representation that that was plaintiff-induced as well? There are two other instances, and I'll refer to both of them. That is Norman Ferguson. The other is Mandy Scott. Mandy Scott is an acquaintance of Mr. Deptula. She's not a customer. She was never in the market for sunscreen. She said, gosh, you know, Peter, I saw this other sunscreen, and I was impressed by this other sunscreen. I don't know why you changed your logo. But that's legitimate evidence, isn't it? But it's not evidence of a confused consumer. Ms. Scott is not in the market for buying sunscreen. She was, and she's also an acquaintance of the plaintiff. The plaintiff faces, in fact, Judge Kobayashi cited below the case of Walter v. Mattel. That says what? It said that attestations from persons in close association with the trademark claimant do not reflect the views of the purchasing public. Do you consider an acquaintance to be in close association? Well, this is a person whose office is right around the corner from, knows Mr. Deptula for years, and on top of that, is not a customer. The core issue in trademark confusion is confusion. Consumer and customer are not synonymous. Well, you do have the standard that the confusion has to be among actual purchasers. Judge Paez, before he came to the Ninth Circuit in the Cairns v. Franklin case, said the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care. That's a 24-F subsection. How about the Carl Stortz case, which says evidence that non-purchasers were confused is also probative? What do you do with that, which is a Ninth Circuit case rather than a district court case? Thank you. It is probative. It is probative of the possibility of actual confusion, but it is not actual confusion. What we're talking about is did the plaintiff come forward with any evidence of actual confusion? But that's for summary judgment. If it's probative, isn't that sufficient to defeat summary judgment? Well, there again, Your Honors, the authorities, and we've cited a number of them, the Ninth Circuit as well as other circuits, say that one isolated instance of confusion is not enough. Mr. Mackey's argument boils down to any single judgment. What case are you relying upon for that? Because entrepreneur media says one instance of actual confusion is enough. So what cases are you relying upon to say that one actual instance is not enough? Well, I think the best quote I can give you, again, it's from a district judge, not the Ninth Circuit, but it's in the circuit's Judge Byrne in the Mattel v. MCA records case, said that befuddlement is part of the human condition. No matter how different the names, no matter how distinctive the bottles, some confusion is inevitable. The fact that plaintiffs can point to some evidence of confusion in the abstract does not automatically mean that such confusion exists among actual purchase, that such confusion affects actual purchasing decisions. Nor does a showing of some actual confusion automatically create a tribal issue effect. Not automatically, but. In the context of this, particularly where plaintiffs had a survey expert, a woman named Dr. Sandra Kogan. However, they didn't submit any survey evidence. And in the Cairns v. Franklin Mint case, Judge Paez said that the plaintiff's failure to present survey evidence supports the inference that there is no actual confusion. In contrast, we, of course, did present survey evidence from an expert, Dr. Lieberman, whom even Mr. Mackey and his expert recognized to be a respected and qualified expert. And that survey, covering both Hawaii and other Sun Belt areas, showed less than 3% rate of confusion. In the Ninth Circuit and every other circuit, that rate of confusion compels summary judgment. It is such a low rate of confusion that that is convincing evidence of no actual confusion. And the plaintiff had the opportunity to conduct a survey, and maybe they did, but they didn't submit to this court or the court below any survey evidence showing actual confusion. We, however, did. We went to that step. And we believe that that survey evidence, combined with the lack of any customer, not a single. There are a number of recognized indicia of confusion. Misdirect letters. Customers who bought the wrong product. Those types of accepted evidence of actual confusion, not a single item of that type of evidence has been submitted by the plaintiffs. And it's because there is no consumer out there who was actually confused into buying either of these two products. You can make that as a blanket statement, that there is no consumer out there who's been confused? There's no evidence of it. Okay. Not a single piece of evidence. And that's what we have to deal with in court. Did he come to court showing any single consumer who was confused between these two products? And the answer to that question is no. And I thank you very much for your questions and your time, Your Honors. Thank you, Counsel. Rebuttal. He says they've been offered an evidence, and so he wants to use them as his exhibits too. You're not going to let him do it?  We've seen them. Don't worry. We've seen them. Well. Well, in the spirit of collegiality, we would hope that he would. I just have a few brief points, Your Honor. Number one is that contrary to the assertion that Mark has always used it as part of a loophole. You know what the difficulty of this holding these things up, and nobody objects to it, but when you both hold them up and you say here to look at it, you're saying we need to try a fact to decide what we're doing. Now, that may be what you're trying to emphasize. Precisely my point, Your Honor. I assume that's what you're trying to emphasize. But the truth of the matter is somebody could look at it and say, as a matter of law, there is no confusion. There can be no confusion. I suppose that's – I don't even suppose. I know that's true in certain cases, but that's certainly not true in this case. It's quite clear. Before I do that, I'd like to address a couple specific points that Mr. White has raised. Number one, he refers to the similarity test as the sight, sound, and meaning. As a matter of fact, the test is sight, sound, or meaning. It doesn't have to look the same. It doesn't have to sound the same, and it doesn't have to and mean the same. It can be any one of those three in order to be similarity. Mr. Mackey, I don't want to waste your time, but I'll tell you what is confusing to me and what I think neither one of you can ignore, and that is the fact that you've got a bunch of surfers who go and look for your mark. He's got a bunch of people who watch the television show Survivor, and they go and look for his mark. This isn't two products that are offered for general consumption. There's one that has its following and another that has its following. And when we look at it, those people aren't going to be confused. They're looking for what they're looking for. Isn't that so? There's no evidence of that, Your Honor. In fact, the parties market their products at the same stores, Sears, J.C. Penney's, and Long's, at the same types of stores, and on the Internet. So to suggest that everybody that buys one of the plaintiff's products is a surfer or everybody that buys one of the defendant's products is necessarily a Survivor TV show aficionado is not how pipe people always buy T-shirts, and it's not how people always buy sunscreen. But it goes to Judge Noonan's initial position, and that is it benefits you. Well, it hasn't. And the fact of the matter is that in the reverse confusion case, it's clear under DreamWorks that what the court is concerned about is the loss of control of your right and your boogers. How much is that worth, Mr. Mackey? How much is that worth? For someone who's been in business for 16 years before this, or I guess it's 14 years before this comes along, it's worth a considerable sum. How much is it worth? Your Honor, I'm not prepared to put a dollar. Why not? Because I don't. When you brought this lawsuit, you must have some idea of the harm. Well, we want two things. I want injunctive relief out of this, and I want... But you asked for damages. We've asked for damages. Well, what did you expect to get? I think our number that we presented in the district court in response to that motion was, I don't remember for sure, Your Honor, but I think it was over $500,000. Well, now, you know at least one judge in this panel is very skeptical of your case. I don't speak for the other two, but you've got a one-third chance of losing. Okay. Would you like a chance to come to a reasonable settlement with the defendants? I always want a chance for a reasonable settlement. Would you like a little time for that? We can do that after the hearing. What's that? I said we can do that when the hearing is over, Your Honor, if that's what you want. I'm always welcome. Well, we have a very effective settlement team at the Nye Circuit.  We did have some discussions with the Nye Circuit. If I was a survivor and I sat through this argument, you wouldn't get very much. Before we do that, Judge Newton, and I'm willing to go there, but I just have about two sentences I'd like to add. My time's up, so may I just add those two sentences before, please? The most, to me, obvious basis to conclude that there's genuine issues of material fact in this case is the fact that we had two judges in the trial court look at this case on essentially identical evidence. We had Judge Gilmour reviewing the preliminary injunction motion and granting in part that motion, necessarily concluding under the Nye Circuit law that it was likely that we would be able to prove likelihood of confusion. We had the second judge. She could have been considering another point, though, and that is that almost all trademark cases raise the question of fact. And she might have been deciding on that. Even though she thinks the jury's going to decide against her. I think we have to assume that Judge Gilmour, and I don't assume I believe it because I know Judge Gilmour quite well, that she was deciding the case consistent with Nye Circuit law and Brookfield decision requires a finding that there'd be, that likely the plaintiff would be able to show likelihood of confusion. The second judge, the same evidence reached a different conclusion. Now, if that's not a clear argument. Well, you've made your argument. But let me tell you, as I hear your ballpark figure, it's flowing out there, 500,000. It's fantastic on the evidence that you were able to produce to defeat summary judgment. You didn't come within, I don't know, one of it. But you have a small nuisance suit. It should have been settled a long time ago. But you've pursued it. You're here. You can have the decision of this Court if you want it. But I think our colleagues, my colleagues would give you a chance to reach a reasonable settlement. Fine, Your Honor. Thank you. Thank you, counsel. That's fine. We'll submit this case subject to settlement talks on the part of the parties. So we delay submission for a period of time, I would think. But it would have to be a brief period of time, in my view. Maybe 30 days. I can do less than that, Your Honor. We'll defer submission for a period of 10 days. Thank you, Your Honor. Thank you, counsel. Submission on this case is deferred for a period of 10 days to allow the parties to pursue settlement discussions. Please apprise the Court in 10 days as to the status of those discussions. Thank you. Thank you. The next case on calendar for argument is People v. Kittiche. I'm sure I pronounced that wrong. All right. Counsel, please proceed. Good morning, Your Honor. First of all, on behalf of the Senate appellate, Mr. Kittiche. Could you please approach the podium?
judges: Silverman, W. Fletcher, Rawlinson